Filed 4/8/25  P. v. Henley CA2/2

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>      Plaintiff and Respondent,<br><br>v.<br><br>JONATHAN DAVID HENLEY,<br><br>      Defendant and Appellant. | B336268<br><br>(Los Angeles County<br>Super. Ct. No. GA066656) |

APPEAL from an order of the Superior Court of Los Angeles County, Darrell S. Mavis, Judge.  Affirmed.

Law Office of Charles Carbone and Charles Carbone for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Nicholas J. Webster and Amanda V. Lopez, Deputy Attorneys General, for Plaintiff and Respondent.

_____

Defendant and appellant Jonathan David Henley appeals from the trial court's order denying his petition for resentencing under Penal Code section 1172.6 (former § 1170.95).[1]  Because defendant is ineligible for section 1172.6 relief as a matter of law, we affirm.

## BACKGROUND

I. *Facts*[2]

   A. The shooting

"On August 9, 2006, at 7:00 p.m., Arthur Spicer (Spicer) was on the north side of Cherry Avenue, between Ivy and California Avenues, in the City of Monrovia, when he saw a light gray or blue car driving down Cherry Avenue.  The car drove across the center of the street, slowed down and stopped next to him.  From 10 feet away, the passenger pointed a small, black, possibly .22-caliber gun at him.  Spicer dropped to the ground and heard two gunshots.  He then saw the car drive up the street at approximately five miles per hour, heard two more gunshots and saw a man fall down near the corner of Cherry and California Avenues.

"At that time, Robert Graves, Jr., (Graves) was washing his car outside his residence at the corner of Cherry and California

---

[1]    All further statutory references are to the Penal Code unless otherwise indicated.

  Effective June 30, 2022, former section 1170.95 was renumbered section 1172.6, with no substantive change.  (Stats. 2022, ch. 58, § 10.)  For simplicity, we refer to the section by its new numbering.

[2]    We provide these facts, drawn from our nonpublished opinion in defendant's direct appeal from his conviction, for context only.

Avenues. . . .  He saw a silver car, with tinted back windows, . . . drive next to him, with the front passenger side nearest him, with its window down.  He did not hear any gunshots before he saw the car, but 'there was [*sic*] people down the street, [he] wasn't really paying attention.'

"The passenger asked Graves, 'What's up, homie?'  When Graves turned to see who was talking to him, the car was two feet away and a gun was sticking out of its window.  Graves could see the driver and a front passenger, but did not see their faces or recognize the passenger's voice.  A shot was fired, hitting Graves in the face.  He fell to the ground and heard two more shots.

"Sharmaine Currie (Currie), who lived on Cherry Avenue, midway between Ivy and California Avenues, was outside of her home when she heard approximately 10 shots.  When she first looked down Cherry Avenue in the direction of the shots, she saw Spicer near Ivy Avenue and a gray or silver Stratus or Intrepid moving down Cherry Avenue towards California Avenue, 'significantly slower' than normal traffic on this street.  Spicer was running around, yelling, 'They're shooting.'  As the car passed her, Currie could not see the occupants' faces, but saw that there was a front passenger and a 'big' driver, who had little hair or was bald.  Both men were Hispanic.  Currie told police that she heard a 'pop' near Spicer, then several shots at the corner of Cherry and California Avenues.

"Omar Gutierrez, who lived on California Avenue, just South of Cherry Avenue, was inside about to leave, when he heard three or four gunshots.  He went outside, saw a gray or silver Intrepid, with tinted windows, driving fast down California Avenue from Cherry Avenue.  He could not see the occupants.

"As a result of the shooting, Graves suffered a bullet wound to his head, requiring surgery of his right eye and placement of a prosthetic piece in his left eye.  He lost his vision in his left eye and had blurry vision in his right eye." (*People v. Henley* (June 22, 2010, B215829) [nonpub. opn.], fn. omitted (*Henley*).)

B. <u>The investigation</u>

"Detective Robert Manuel, the investigating officer, received information that a gray Dodge Intrepid with tinted windows was involved in the shooting.  He located a car meeting that description parked in front of [defendant]'s residence in Azusa, registered to [defendant]. . . .  [¶]  Detective Manuel searched the car and found a box of .22-caliber bullets in the front, center console and a .22-caliber revolver under the driver's seat.  No ballistics evidence was recovered at the scene." (*Henley*, *supra*, B215829.)

C. <u>Interview of defendant</u>

"Detective Manuel interviewed [defendant] several times, once in a video-recorded interview at the police station. . . . [Defendant] admitted owning the car found in front of his residence.  He said that on the day of the shootings, he left work and went to Certified Market to buy some beer.  There, he met 'a guy,' Robert, whom he had not 'seen in a while.'  Robert was with Robert's cousin, Jesse, whom [defendant] was 'sure [he] was from somewhere' because of his baggy clothing and white T-shirt.

"Robert asked [defendant] to drive him and Jesse to Duarte Road.  On the way, they drove down Cherry Avenue 'at a regular pace.'  Robert was in the front seat, and Jesse was in the back. Jesse rolled down his window, fired a gun at a Black man washing his car and said, 'Fuck that fool. . . .'  This surprised [defendant], who did not know what to do, so he took off as fast as

4

he could. He dropped Robert and Jesse off at a liquor store on Duarte Road and then went home. [Defendant] denied . . . shooting anyone . . . . At one point in the interview, [defendant] asked how much jail time he would do, and, at another time, asked, 'So what's my best deal right now?'" (*Henley, supra*, B215829.)

II. *Procedural History*

    A. <u>Conviction and sentencing</u>

In 2008, a jury found defendant guilty of the attempted murder of Graves (§§ 664, 187, subd. (a); count 1), assault with a firearm (§ 245, subd. (a)(2); count 3), and aggravated mayhem (§ 205; count 7). The jury found true a gang enhancement (§ 186.22, subd. (b)(1)) as to all three counts. As to count 1, the jury found true the allegation that the attempted murder was willful, deliberate, and premeditated. As to counts 1 and 7, the jury found true the allegation that a principal personally and intentionally discharged a firearm causing great bodily injury within the meaning of section 12022.53, subdivisions (d) and (e)(1).

The trial court sentenced defendant to serve a term of life plus 25 years to life in state prison.

    B. <u>Direct appeal</u>

On direct appeal, we reversed the true findings on the gang enhancement but otherwise affirmed the judgment. (*Henley, supra*, B215829.)

    C. <u>Resentencing</u>

On remand, appellant was resentenced to a prison term of life with the possibility of parole.

D.  Section 1172.6 petition

In August 2022, defendant, who was represented by counsel, filed a petition for resentencing pursuant to section 1172.6.  The People opposed the petition, arguing that defendant was ineligible for relief because he was convicted based on a theory of being a direct aider and abettor and that no jury instructions were given, nor theory presented, on felony murder or the natural and probable consequences doctrine.

The trial court held a hearing on defendant's section 1172.6 petition in December 2023.  After entertaining oral argument, the court denied the petition, concluding that defendant had not made a prima facie showing of entitlement to relief.  The court explained that it was "denying [the petition] for all of the reasons that [we]re stated in the People's response[.]"

E.  Appeal

Defendant timely appealed from the order denying his section 1172.6 petition.

## DISCUSSION

I. *Relevant Law*

Effective January 1, 2019, Senate Bill No. 1437 (2017–2018 Reg. Sess.) substantively amended sections 188 and 189 to "eliminate[] natural and probable consequences liability for murder as it applies to aiding and abetting[] and limit[] the scope of the felony-murder rule.  [Citations.]"  (*People v. Lewis* (2021) 11 Cal.5th 952, 957 (*Lewis*).)  The bill also added what is now section 1172.6 to provide a procedural mechanism for defendants who could no longer be convicted of murder because of the changes made to sections 188 and 189 to petition for retroactive relief. (*Lewis, supra,* at p. 959.)  Senate Bill No. 775 (2021–2022 Reg. Sess.) subsequently "expanded the class of defendants

6

entitled to relief to those convicted of attempted murder under the natural and probable consequences doctrine.  [Citations.]" (*People v. Rodriguez* (2024) 103 Cal.App.5th 451, 457.)

In order to obtain resentencing relief, a defendant convicted of attempted murder must allege that (1) an information was filed against him allowing the prosecution to proceed under a theory of attempted murder under the natural and probable consequences doctrine (§ 1172.6, subd. (a)(1)); (2) he was convicted of attempted murder (§ 1172.6, subd. (a)(2)); and (3) he could not now be convicted "because of changes to [s]ection 188 or 189 made effective January 1, 2019" (§ 1172.6, subd. (a)(3)).

Upon the filing of a properly pleaded petition for resentencing, the trial court must conduct a prima facie analysis to determine the defendant's eligibility for relief.  (§ 1172.6, subds. (b)(3) & (c); *People v. Strong* (2022) 13 Cal.5th 698, 708; *Lewis*, *supra*, 11 Cal.5th at pp. 957, 960.)  "[T]he prima facie inquiry . . . is limited. . . .  '"[T]he court takes [a] [defendant]'s factual allegations as true and makes a preliminary assessment regarding whether the [defendant] would be entitled to relief if his or her factual allegations were proved.  If so, the court must issue an order to show cause"'" and set the matter of an evidentiary hearing.  (*Lewis*, at p. 971.)

In making this assessment, the trial court may consider the defendant's record of conviction.  (*Lewis*, *supra*, 11 Cal.5th at pp. 970–971.)  "The record of conviction will necessarily inform the trial court's prima facie inquiry . . . allowing the court to distinguish petitions with potential merit from those that are clearly meritless."  (*Id.* at p. 971.)  However, "the court should not make credibility determinations or engage in 'factfinding

involving the weighing of evidence or the exercise of discretion.' [Citation.]" (*Id.* at p. 974.)

II. *Standard of Review*

We review de novo the trial court's denial of a section 1172.6 petition at the prima facie stage. (*People v. Coley* (2022) 77 Cal.App.5th 539, 545 (*Coley*); see also *People v. Muhammad* (2024) 107 Cal.App.5th 268, 276 (*Muhammad*), review granted Feb. 19, 2025, S288860 ["The trial court's denial of a resentencing petition at the prima facie stage "'is a purely legal conclusion[]""'"].)

III. *Analysis*

Applying these legal principles, we conclude that the trial court properly denied defendant's section 1172.6 petition. As described above, a successful prima facie case for section 1172.6 relief requires a defendant to aver, inter alia, that he could no longer be convicted "because of" the 2019 statutory changes. (§ 1172.6, subd. (a)(3).) Defendant cannot satisfy this requirement here because the record of conviction conclusively establishes that he was convicted of attempted murder under a theory of direct aiding and abetting, a theory unaffected by the 2019 changes to sections 188 and 189. (See *Coley*, *supra*, 77 Cal.App.5th at p. 548 ["Direct aiding and abetting remains a valid theory of attempted murder"].)

"[W]ith respect to attempted murder, section 1172.6 affords relief only to a person convicted under the natural and probable consequences doctrine. [Citation.]" (*Muhammad*, *supra*, 107 Cal.App.5th at p. 276.) Here, however, the jury that convicted defendant was not instructed on the natural and probable consequences doctrine or any other theory allowing

8

malice to be imputed on defendant.[3]  Rather, the jury was instructed with CALCRIM Nos. 400 and 401 on direct aiding and abetting principles.  CALCRIM No. 401 informed the jury that, as an aider and abettor, defendant had to "kn[o]w that the perpetrator intended to commit the crime" and had to "intend[] to aid and abet the perpetrator in committing the crime."  The jury was also instructed with CALCRIM No. 600, which explained that to prove defendant's guilt for attempted murder, the People were required to prove that "defendant intended to kill" the victim.

The jury thus could not and did not convict defendant of attempted murder based on the natural and probable consequences doctrine, rendering defendant ineligible for section 1172.6 relief as a matter of law.  (*Coley*, *supra*, 77 Cal.App.5th at p. 548; see also *People v. Cortes* (2022) 75 Cal.App.5th 198, 205 [a petitioner is ineligible for § 1172.6 relief as a matter of law if the jury instructions show that jurors were not instructed on any theory of murder liability that allowed malice to be imputed].)

Defendant resists this conclusion with what boils down to two arguments.  Neither has merit.

First, defendant relies primarily on *People v. Powell* (2021) 63 Cal.App.5th 689 (*Powell*) and *People v. Langi* (2022) 73 Cal.App.5th 972 (*Langi*) to argue that the jury instructions permitted the jury to impute onto him the actual perpetrator's murderous intent.  Both cases are inapposite.  *Powell*, a direct appeal from a murder conviction, concluded that the standard

---

[3]  Nor was the jury instructed on felony murder, as "California has no crime of attempted felony murder. [Citations.]"  (*People v. Billa* (2003) 31 Cal.4th 1064, 1071, fn. 4.)

9

aiding and abetting instructions "were not tailored" to fit the theory of implied malice murder. (*Powell*, *supra*, at p. 714.) Relying on *Powell*, *Langi* held that the summary denial of a section 1172.6 petition should be reversed where the record showed that a defendant was convicted as an aider and abettor of implied malice murder using the standard jury instructions. (*Langi*, *supra*, at pp. 982–984.)

The reasoning found in *Powell* and *Langi* simply does not apply here, where defendant was convicted of attempted murder, not implied malice murder. "[A]*ttempted* murder requires a specific intent to kill" (*People v. Mumin* (2023) 15 Cal.5th 176, 190), and defendant's jury was so instructed with CALCRIM No. 600. (Cf. *Coley*, *supra*, 77 Cal.App.5th at p. 547 [*Langi* inapplicable where the defendant was convicted of express, not implied, malice murder].)

<u>Second</u>, defendant contends that substantial evidence does not support a finding that he harbored malice or an intent to kill. This argument is improper because "[t]he mere filing of a section 117[2.6] petition does not afford the petitioner a new opportunity to raise claims of trial error or attack the sufficiency of the evidence supporting the jury's findings. To the contrary, '[n]othing in the language of section 117[2.6] suggests it was intended to provide redress for allegedly erroneous prior factfinding. . . . The purpose of section 117[2.6] is to give defendants the benefit of amended sections 188 and 189 with respect to issues not previously determined, not to provide a do-over on factual disputes that have already been resolved.' [Citation.]" (*People v. Farfan* (2021) 71 Cal.App.5th 942, 947.) We thus reject any claim challenging the sufficiency of the evidence underlying defendant's convictions.

## DISPOSITION

The order denying defendant's section 1172.6 petition for resentencing is affirmed.

<u>NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS</u>.


_____, Acting P. J.
ASHMANN-GERST


We concur:


_____, J.
CHAVEZ


_____, J.
RICHARDSON